Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 2086 | DATE | Aug. 21, 2002 |
| CASE TITLE | United States of America    v    JEFF BOYD | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order entered. Accordingly, petitioner's §2255 petition for a writ of habeas corpus is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | AUG 22 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| GDS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

AUG 2 2 2002

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>) | |
| ) | No.  01 C 2086 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| JEFF BOYD ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

After being tried and convicted, having his conviction reversed, and then being retried and convicted again, this time with an unsuccessful direct appeal, Jeff Boyd has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2255.[1] Petitioner's claims are aimed at his 50-year sentence for convictions of racketeering conspiracy under 18 U.S.C. §1962(d), narcotics conspiracy under 21 U.S.C. §846, attempted murder in furtherance of the racketeering enterprise under 18 U.S.C. §1959(a)(5), and murder in furtherance of the racketeering enterprise under 18 U.S.C. §1959(a)(1).[2] For the reasons explained below, the court finds petitioner's claims to be procedurally defaulted or without merit, and therefore denies his petition.

---

[1] The lengthy history of petitioner's case can be found in United States v. Boyd, 208 F.3d 638 (7th Cir. 2000), and United States v. Boyd, 55 F.3d 239 (7th Cir. 1995). This court was assigned to consider the instant petition after Judge Zagel, who presided over petitioner's trial and sentencing, granted petitioner's motion for recusal under 28 U.S.C. §455(a). See United States v. Boyd, 2002 U.S. Dist. LEXIS 334 (N.D. Ill. January 11, 2002).

[2] More specifically, petitioner was sentenced to concurrent terms of 20 years for his racketeering conspiracy conviction, 50 years for his narcotics conspiracy conviction, 10 years for his attempted murder in furtherance of the racketeering enterprise conviction, and 50 years for his murder in furtherance of the racketeering enterprise conviction.

## BACKGROUND

According to testimony at his trial, petitioner and his four codefendants were members of Chicago's "El Rukn" street gang, and their 1996 convictions resulted from the continuing and wide-ranging conspiracy they had beginning in the mid-1960s to sell narcotics and murder members of rival gangs who threatened to take over their drug-sale "turf." Petitioner's codefendants were each sentenced to life in prison.

## HABEAS CORPUS STANDARD

"Habeas corpus relief under 28 U.S.C. §2255 is limited to an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Bischel v. United States, 32 F.3d 259, 263 (7th Cir. 1994) (internal quotations and citations omitted). The record is reviewed and all reasonable inferences are drawn in favor of the government. Id.; Messinger v. United States, 872 F.2d 217, 219 (7th Cir. 1989).

## DISCUSSION

The instant petition asserts five grounds each with numerous claims. The government has aptly grouped petitioner's claims into three main categories: those asserting misconduct on the part of the government with respect to petitioner's conviction, those taking issue with petitioner's sentence, and those claiming that petitioner received ineffective assistance of counsel at each stage of the proceedings. The court will address petitioner's claims in this order.

## A. GOVERNMENT MISCONDUCT

### 1. Knowing Use of Perjured Testimony

Petitioner claims that the government knowingly presented perjured testimony by three witnesses. Relief based on this claim is warranted only if petitioner can establish that: (1) the government's case included false testimony; (2) the government knew or should have known the testimony was false; and (3) there is a reasonable probability, sufficient to undermine confidence in the verdict, that without the false testimony the outcome of the trial would have been different. Shasteen v. Saver, 252 F.3d 929, 933 (7th Cir. 2001). As the Shasteen court explained,

> Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony. The alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence. We must determine, when the defendant alleges that the prosecution used perjured testimony, whether the defendant had an adequate opportunity to expose the alleged perjury on cross-examination. A defendant need not prove beyond a reasonable doubt that the witness's testimony was knowingly false (and hence perjury). In fact, the wrong of knowing use by prosecutors of perjured testimony is different, and misnamed—it is knowing use of false testimony. It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false. As a consequence, we do not employ the term of perjury in a technical, legal sense in these types of cases, but rather as a term of art that describes the knowing use of false testimony.

Shasteen, 252 F.3d at 933 (internal quotations and citations omitted).

#### a. Testimony of Earl Hawkins

Petitioner asserts that the government knowingly used false testimony by Earl Hawkins, an El Rukn "general" who pleaded guilty and testified for the government at petitioner's trial. According to petitioner, Hawkins's testimony that he and petitioner sold "T's and Blues" (illegal narcotics in pill form that, when ground together, dissolved and injected, produce an effect similar to heroin) in 1978, and that petitioner sold marijuana from 1977 on, was false and the

3

government knew it to be so based on records and testimony introduced at trial demonstrating that petitioner was incarcerated for much of the 1970's and was not released until July 1979.

The problem with petitioner's argument is that it relies on a mischaracterization of Hawkins's testimony, as noted by the government. Hawkins testified generally that the El Rukn gang sold T's and Blues, as well as marijuana and codeine syrup, between 1975 and 1985, and that at times during that period he had participated in the sale of those drugs with all four of the El Rukn defendants on trial, including petitioner. Hawkins also testified generally that beginning in 1977, the El Rukns, including petitioner and his codefendants, obtained marijuana for resale from "the Fort," an old movie theater in Chicago that the government contends the El Rukns took over and turned into their fortified headquarters. Importantly, Hawkins never testified that petitioner sold drugs during the specific period in which he was incarcerated.[3] Thus, petitioner has failed to show that Hawkins's testimony was actually false, defeating his claim.

### b. **Testimony of Charles Poree and John Najokas**

Petitioner next asserts that the government knowingly used false testimony by Charles Poree ("Poree"), an eye-witness to the "drive-by" triple murder in late-April 1985. Poree testified that after the car stopped, he saw one man step out of the front passenger door, and he saw petitioner lean out of the rear passenger-side window (which was rolled down), to shoot at the three victims and others. Petitioner argues that Poree's testimony with respect to his role in

---

[3] And, contrary to petitioner's assertion, the government did not argue in its closing argument that petitioner sold drugs during the period in which he was incarcerated. Petitioner argues in his petition that, "Despite possessing documented evidence and hearing official testimony at the retrial, [the] government prosecutor still argued in closing that Petitioner sold pills and marijuana with co[o]perator Hawkins in the 1970's." The transcript page to which petitioner refers the court indicates, however, that the government actually argued that "in the late 1970s [petitioner] began selling pills and marijuana at the Crest Hotel with Earl Hawkins."

4

the shooting was shown to be false through the testimony of John Najokas ("Najokas"), a crime lab technician who recovered and examined the car used in the shooting. According to petitioner, Najokas testified inconsistently in petitioner's state and federal trials for the murders,[4] and one of those versions contradicts the testimony Poree gave at petitioner's federal trial. Had it been aware of that inconsistency, petitioner argues, "the jury could have reasonably rejected Poree's and Najokas['s] entire testimony," and "without the testimony of Poree, the government could not have proven Petitioner guilty [of the homicide] beyond a reasonable doubt."

Assuming that petitioner's account of the testimony of Poree and Najokas is correct, the inconsistencies between Najokas's state and federal court testimony do not prove Poree's testimony false. Poree saw the car used in the shooting at the time that event occurred. Conversely, Najokas did not see the car until after it had been driven from scene of the shooting, abandoned by the shooters, and subsequently discovered by the police. Thus, Najokas's answer to whether the windows were up when he saw the car—whether affirmative or negative—does not prove Poree's answer to that question to be false, because the position of the windows between the two sightings could have changed.

Consequently, rather than demonstrate that Poree testified falsely, petitioner's argument establishes at most only that Najokas gave inconsistent testimony in petitioner's state and federal trials. As explained above, however, establishing mere inconsistencies in a witness's testimony is not enough to sustain a claim that the government knowingly used perjured testimony.

---

[4] In petitioner's state court trial Najoukas testified that when he approached the car its windows were rolled up. In petitioner's federal court trial, Najoukas testified that the windows were rolled down when he approached the car.

5

Shasteen, 252 F.3d at 933; United States v. Saadeh, 61 F.3d 510, 523 (7th Cir. 1995). Accordingly, the petition for a writ of habeas corpus is denied on this ground.

## 2. **Suppression of Evidence**[5]

Petitioner's next claim is that he was deprived of a fair trial because the government improperly suppressed evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). As explained by the Seventh Circuit in Boss v. Pierce, 263 F.3d 734 739-40 (7th Cir. 2001), Brady and its progeny establish an "affirmative duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment." "To establish a Brady violation, [petitioner] must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to [petitioner's defense], and (3) the evidence was material to an issue at trial." Id at 740.

According to petitioner, the government has suppressed information gleaned from its "Operation Top Brass" investigation, which he asserts took place in the late 1970's and early 1980's and was aimed at "the El Rukns and pills." Petitioner claims that he began requesting "any and all materials relating to [this] investigation" from defendants in 1997 (after he was convicted) pursuant to his right under the Freedom of Information Act ("FOIA"). Petitioner requests that this court intervene and "enter an order directing the United States Attorney's Office and other law enforcement agencies, involved in the top brass T's and Blues investigation, to produce any and all materials relating to the investigation."

---

[5] In addition to the suppression claim discussed below, petitioner also argues that the government knowingly suppressed information contained in a "portfolio" that was seized from other El Rukns in the "mid 1980's." The government's answer demonstrates that this claim is procedurally defaulted because it was not raised prior to the filing of the instant petition. Petitioner does not address that argument in his reply (labeled a "traverse") or attempt to establish cause and prejudice as required by Coleman v. Thompson, 501 U.S. 722, 753 (1991). The court consequently finds the claim procedurally defaulted.

6

Simply put, petitioner's argument fails to establish any of the three necessary elements for setting forth a <u>Brady</u> violation. Petitioner does not explain what information came to light as a result of the "Operation Top Brass" investigation, he does not explain whether the government suppressed any of that information at his trial, and, if it did, he does not explain whether the suppressed information was favorable to him or material to an issue raised during his trial.

Faced with this observation in the government's answer, petitioner replies that he cannot satisfy these requirements because the government has failed to produce the information identified in his FOIA request. That may be true, but the court will not join petitioner on his quest for identifying constitutional errors worthy of habeas corpus relief under 28 U.S.C. §2255—the court's role is only to consider such claims once they are identified and to determine whether they indeed present "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." <u>Bischel</u>, 32 F.3d at 263 (internal quotations and citations omitted). Thus, the court denies habeas corpus relief under 28 U.S.C. §2255 on this basis.

## B. SENTENCING CLAIMS

Petitioner first takes issue with his sentence by arguing that it is "excessive" and based on "improper factors" that "it is not improbable that the sentencing judge relied on and was influenced by." Almost all of the "improper factors" to which petitioner refers are the same statements petitioner unpersuasively claimed above to be false (e.g., that petitioner sold marijuana, cocaine, and heroin in the 1970's—when he was actually incarcerated until 1979). Having nonetheless considered all of the "improper factors" asserted by petitioner, the court

7

concludes that this argument fails to meet the standard for §2255 habeas relief articulated in Bischel, 32 F.3d at 263.

Petitioner also contests the specific sentence he received for his narcotics conspiracy conviction on two grounds. First, petitioner argues that because he was charged with conspiring to possess with intent to distribute cocaine, heroin, marijuana, T's and Blues pills, and codeine syrup, and because the jury returned a general verdict without specifying which drug or drugs petitioner distributed, he should have been sentenced under the statute carrying the lowest statutory penalty. Second, petitioner maintains that because no specific drug quantity was found by the jury that convicted him, the maximum term that he was subject to under Apprendi v. New Jersey, 530 U.S. 433 (2000), was 20 years (due, in part, to his lack of a prior drug conviction). The court is not persuaded by either argument.

To begin, as the government points out in its answer and as petitioner once again fails to address in his reply, petitioner's claims are procedurally defaulted because petitioner did not raise them below. Notably, petitioner's second argument was raised in his certiorari petition to the Supreme Court, but, unlike his codefendants who made the same argument to the Court, petitioner's appeal was not remanded to the Seventh Circuit for further review.[6] Even if it had been remanded, it is clear that the Seventh Circuit would have reached the same conclusion with respect to petitioner that it reached with respect to his codefendants:

---

[6] The government speculates that the reason for the difference may have been that, even if it did merit reconsideration under Apprendi, petitioner's sentence was nonetheless upheld because any Apprendi claim that he may have would be rendered harmless error due to the fact that petitioner was found guilty of murder in furtherance of a racketeering enterprise and sentenced to a concurrent 50-year term for that crime.

8

> [T]he government argues that the Apprendi error was harmless because the evidence shows beyond any possible doubt that the defendants, whose vast drug conspiracy is detailed in the opinion that the Court remanded, United States v. Boyd, 208 F.3d 638 (7th Cir. 2000) were responsible for such a large quantity of drugs that had the jury been correctly instructed, it would have found them guilty beyond a reasonable doubt of the offenses for which they were sentenced. We agree, therefore, with the government's suggestion that the original judgments be, and they hereby are, reinstated. United States v. Jackson, 236 F.3d 886 (7th Cir. 2001) (per curiam).

United States v. Green, 2001 U.S. App. LEXIS 7298, *1, 2001 WL 338109 (7th Cir. 2001).

## C. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Petitioner's final group of arguments assert that his lawyer, Jed Stone ("Stone"), rendered ineffective assistance at trial, in briefing the post-trial motions, at sentencing, and on direct appeal. To prevail on his claim of ineffective assistance of counsel, petitioner must show that his counsel's conduct "fell below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. 668, 690 (1984). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. Strategic decisions of counsel are not second-guessed. United States v. Ruzzano, 247 F.3d 688, 696 (7th Cir. 2001). Petitioner must also show prejudice by demonstrating that it is reasonably likely that, but for his counsel's errors, the decision reached would have been different. Strickland, 466 U.S. at 696. Petitioner's counsel's errors must be so serious as to deprive the petitioner of a fair trial, that is, a trial whose result is reliable. Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). In other words, petitioner "must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors . . . the factfinder would have had a reasonable doubt respecting

9

guilt.'" United States v. Adamo, 882 F.2d 1218, 1226 (7th Cir. 1989) (quoting Strickland, 466 U.S. at 695-96).

**1. At Trial**

All of petitioner's claims regarding attorney Stone's ineffectiveness at trial are aimed at petitioner's conviction for murder in furtherance of the racketeering enterprise. Petitioner first argues that Stone was ineffective because he failed to confront Poree on cross-examination with the car photos taken by Najoukas. This argument fails for the same reason its counterpart failed above; Poree viewed the car well before Najoukas took the picture and, therefore, any inconsistency between Poree's testimony and the photograph is not impeaching. Given this, the court concludes that Stone's failure to cross-examine Poree with the car photographs was not objectively unreasonable.

Petitioner next argues that Stone should have called to the stand one of the Chicago Police officers who questioned Poree after the shooting. If called, petitioner argues, the officer would have testified that when he interviewed Poree after the shooting, Poree did not say anything about a second shooter, and also that Poree was later unable to identify a photograph of petitioner as depicting the second shooter. The government aptly responds to this argument by pointing out that, rather than call the officers, Stone entered into a stipulation with the government which provided that if called, the officer would testify that the day after the shooting, Poree's account of the incident referred to only one shooter. The government also notes that, contrary to petitioner's assertion, it was the *driver* who Poree failed to identify in a lineup, not petitioner (a fact brought out on direct and cross-examination of Poree at trial); Poree identified

10

petitioner as the second shooter at a second lineup and he also authenticated a photograph of that lineup, and correctly pointed out petitioner as the man he identified, during petitioner's trial. Given these revelations, the court concludes that Stone's failure to call one of the officers who interviewed Poree after the shooting was not objectively unreasonable.

Next petitioner claims that Stone should have called a Detective Stout ("Stout") whom petitioner claims administered a lie detector test to Richard Bell ("Bell"), the owner of the car used in the shooting. According to petitioner, if Stout had been called, he would have testified that when he administered the polygraph to Bell, he said that he had abandoned his car because it had mechanical problems (rather than admitting—as he later did—that he had loaned it to Roderick Haygood, the man later identified by Poree as the driver of the car at the time of the shooting). Petitioner argues that "Stout's testimony would have cast doubt on Bell's overall credibility." That may be true, but it does not follow that Stone's failure to call Stout was objectively unreasonable; at trial, Bell admitted that he had lied to Stout in this respect and, consequently, there was little to be gained by calling Stout.

Petitioner also argues that Stone rendered ineffective assistance because he failed to refresh the memory of Chicago Police officer Ward Hull ("Hull"), who was the first to find the car that had been used in the murder. Petitioner asserts that in the first trial, Hull testified that the car windows were rolled up and that there were no bullet holes through the windows, whereas in the second trial, Hull testified that he could not recall the position of the windows "at this time." Petitioner asserts that, "Hull's refreshed memory would have exposed Poree's and Najoukas' false testimony that the windows were rolled down." Again the court disagrees. Even if Hull's memory were "refreshed" with his prior testimony (or, more appropriately, even if he were

11

impeached with that testimony), Poree's testimony would not have been shown to be false. As explained above, Poree's observation of the car windows occurred prior to Najoukas's, and the position of the windows in-between could have changed. Refreshing Hull's recollection would, however, have brought to light the fact that his prior testimony contradicted that given by Najoukas, but that disclosure is no more powerful than Najoukas's own admission during cross-examination that he previously testified that the window was rolled up when he got to the car. Thus, in the end, refreshing Hull's recollection would simply have brought out his prior testimony, indicating that although he now claimed to not recall the position of the car windows, at one point he claimed to recall that information. Failing to make a showing as weak as this does not make petitioner's counsel constitutionally ineffective, however, and it does not establish a reasonable likelihood that, had Stone not erred in this respect, the ultimate decision as to the instant count would have been different.

Finally, petitioner argues that Stone was ineffective for failing to call Andre Chalmers ("Chalmers"), a witness to the shooting whose brother was a victim. According to petitioner, if called, Chalmers would have testified that he has known petitioner for more than fifteen years, and that he did not see petitioner on the night of the shooting. If given, such testimony could have been probative; according to the government, Chalmers was a rival gang member of petitioner's, and he was one of the people at whom bullets were being shot. But petitioner has provided no support for his claim about what Chalmers (who did not testify in either of petitioner's trials) would have said if called to the stand, and therefore petitioner's claim carries little weight. Accordingly, the court concludes that Stone's failure to call Chalmers to testify was

not objectively unreasonable and that petitioner has not shown that it is reasonably likely that, but for Stone's failure to call Chalmers, he would have been found not guilty of the murder charges.

## 2. **Post-Trial and Sentencing**

Petitioner's post-trial argument is that his counsel was ineffective because he failed to file a timely motion for a new trial. As demonstrated by Judge Zagel's decision, reported at United States v. Boyd, 172 F.R.D. 363 (N.D. Ill. 1997), petitioner is correct that his counsel erred. Such error did not prejudice petitioner, however, because Judge Zagel addressed petitioner's arguments substantively and found them to be without merit. Indeed, the arguments that petitioner claims Stone should have made in his post-trial motion are identical (or at least comparable) to the very arguments that the court has addressed and dismissed above. See id. at 368-69 (discussing petitioner's claims that the government knowingly presented perjured testimony and concluding that: "Boyd . . . operate[s] on the assumption that when a witness says something at first, any later variance from that first statement is perjury[, which is] . . . overreaching and unpersuasive, a bad rule of law and of life . . . [a]nd one that has no support in the decided cases") (citing United States v. Payne, 102 F.3d 289 (7th Cir. 1996); United States v. Adcox, 19 F.3d 290 (7th Cir. 1994)). Thus, petitioner has failed to show that, but for his counsel's failure to file a timely post-trial motion for a new trial, that motion would have been granted.

Petitioner's claim that Stone was ineffective at his sentencing is also familiar in that it takes issue with Stone's failure to object to the "improper factors" listed in the amended version of the offense that the government provided to Judge Zagel at sentencing. As discussed above,

13

the majority of the "improper factors" to which petitioner refers are the same trial testimony described above that petitioner unpersuasively claimed to be false (e.g., that petitioner sold marijuana, cocaine, and heroin in the 1970's—when he was actually incarcerated until 1979). Having again nonetheless considered all of the "improper factors" asserted by petitioner, the court concludes that petitioner has not shown that, were it not for Stone's failure to object to these "improper factors," petitioner's sentence would have otherwise been lower.

### 3. Direct Appeal

Petitioner's final claim is that Stone provided ineffective assistance because, put simply, he waived petitioner's challenge to a well-established Seventh Circuit holding (that nonetheless represents the "minority position" among circuits) after Stone sought to appeal that holding and a panel of the Seventh Circuit denied the motion. The government calls this petitioner's "only serious issue" raised in the petition, but the court does not find it serious at all.

Petitioner's argument can be traced back to the pre-trial motion made by petitioner and his codefendants seeking recusal of Judge Zagel, who, they argued, was biased against them or whose "impartiality might reasonably be questioned." See 28 U.S.C. §455(a) (setting forth the standards to be applied by judges for recusing themselves from cases where they are actually biased toward one side, or where they appear to be biased toward one side). That motion was denied by Judge Zagel and, pursuant to a long line of Seventh Circuit precedent holding that such motions could be reviewed only by way of a pre-trial petition for mandamus, a pre-trial mandamus petition was subsequently filed. Notably, the Seventh Circuit denied the mandamus petition, without comment, in an unpublished order. Then, on direct appeal, petitioner and his

14

codefendants expressly waived any challenge to the mandamus-only rule for review of §455(a) motions by stating that, "the motion for recusal under 28 U.S.C. §455(a) could only be, and was, appealed by mandamus.'" See Boyd, 208 F.3d at 645. Although the majority of the panel affirmed the convictions and found any further argument about the merits of the mandamus-only rule waived, one member of the Seventh Circuit panel hearing the appeal, Judge Ripple, dissented and argued that the mandamus-only rule ought to be discarded. Id. at 649-652. All three judges on the panel voiced their opinion, in *dicta*, that Judge Zagel should have recused himself based on the appearance of bias under §455(a). Id. at 648-652

Petitioner now argues that Stone's waiver of this argument constitutes ineffective assistance of counsel. The court disagrees. Petitioner's counsel's waiver of further argument on the mandamus-only limitation was not objectively unreasonable, and petitioner has not shown (and cannot show) that but for counsel's waiver, the ultimate decision of the Seventh Circuit on direct appeal would have been different. Indeed, it is reasonable—and usually advisable, absent changed circumstances of law or fact—to decline to reraise an argument before a court that has already rejected that very same argument.[7] See also Valenzuela v. United States, 261 F.3d 694, 700 (7th Cir. 2001) (noting that the Sixth Amendment does not require that counsel be able to "forecast changes or advances in the law"). Further, because two out of the three members of the Seventh Circuit panel that heard petitioner's direct appeal voiced no opinion about the merit of

---

[7] As the government notes, "a renewed challenge on direct appeal would have required Stone to overcome three daunting problems—challenging the mandamus-only rule, convincing a second panel that there was an appearance of bias when the first panel had found the claim meritless, and persuading the second panel that it had the authority to reverse after the third panel had ruled the other way."

15

the mandamus-only limitation for appealing denials of motions to recuse, it is not possible for petitioner to show that but-for his waiver, the outcome of petitioner's appeal would have been different. For these reasons, the court denies the petition for a writ of habeas corpus on this ground.

## CONCLUSION

Having considered and rejected each of petitioner's claims in support of his petition for a writ of habeas corpus, the court denies the petition.

**ENTER:** **August 21, 2002**

Robert W. Gettleman
United States District Judge